FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

SEP 2 8 2009   ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
VINCENT'S OF MOTT STREET, INC. and
VINCENT GENEROSO,

                             Plaintiffs,

    — against —

QUADAMI, INC.,

                             Defendant.
----------------------------------------------------------------X

**MEMORANDUM & ORDER**

05-CV-4358 (SLT)

**TOWNES, United States District Judge:**

    Plaintiff Vincent's of Mott Street, Inc. is a New York corporation having its principal place of business in New York. Plaintiff Vincent Generoso is the president, owner and sole shareholder of Vincent's of Mott Street, Inc. Vincent's of Mott Street, Inc. and Generoso (collectively "Plaintiffs") own and operate an Italian restaurant located at 119 Mott Street in Little Italy, New York. Quadami, Inc. ("Defendant") is a New York corporation which owns Vincent's Clam Bar, an Italian seafood restaurant located in Carle Place, Long Island.

    Plaintiffs' complaint raises five claims against Defendant, including causes of action under (1) the Lanham Act for service mark infringement, 15. U.S.C. § 1114, and (2) false designation of origin or unfair competition, 15 U.S.C. § 1125(a); (3) the Federal Trademark Dilution Act ("FTDA") for service mark dilution, 15 U.S.C. § 1125(c); (4) common law unfair competition; and (5) New York General Business Law § 360-1 for dilution. Both parties move for summary judgment. The Court hereby grants summary judgment in favor of Defendant and dismisses all claims.

## BACKGROUND

Beginning in 1904, members of the Siano family started "Vincent's Clam Bar" located at 119 Mott Street in Little Italy, New York ("Mott Street restaurant") and continuously operated the establishment until 1979.   On September 29, 1979, the Siano family sold the restaurant along with the use of the name "Vincent's Clam Bar" to Andrew DeLillo, either in his individual capacity or as the principal of a corporation.  Ex. C.[1] At some point prior to 1985, DeLillo or his corporate interests opened additional restaurants under the name "Vincent's Clam Bar" outside of Manhattan and started a business making and selling sauces.  Ex. GG, U.S. Patent and Trademark Office, Trademark Trial and Appeal Board Dec. (Sept. 30, 2002) (hereinafter, "TTAB Dec.") 5.

One restaurant located in Carle Place, New York came to be known as "Vincent's Clam Bar" ("Carle Place restaurant") by virtue of a franchise agreement dated July 23, 1980, between Brinlaw, Inc., and Vincent's Clam Bar of Mott & Hester Streets, Inc. ("VCBMHS, Inc.").[2]  Ex. E.  On March 15, 1983, Brinlaw, Inc., sold its Carle Place restaurant to defendant Quadami, Inc. Ex. F.  Also on that date, VCBMHS, Inc. executed a franchise agreement with Quadami, Inc, permitting the Defendant the right to use the "Vincent's Clam Bar" name at the Carle Place location.  Ex. G.  The Defendant has owned and continuously operated the Carle Place restaurant as "Vincent's Clam Bar" or other variations thereof since 1983.  Marisi Aff. ¶ 13.

---

[1]   Unless otherwise stated, all exhibits referenced herein are found in the Tucker Declaration.
[2]   Vincent's Clam Bar of Mott & Hester Streets, Inc. was a Siano-owned corporation that was transferred to DeLillo. Ex. D, Tucker Decl. The 1980 franchise agreement was signed on behalf of the franchisor, Vincent's Clam Bar of Mott & Hester Streets, Inc., by Andrew DeLillo. Ex. E., Tucker Decl.

On April 25, 1985, the original Mott Street restaurant, then apparently under the ownership of "Mott & Hester Restaurant Corp.,"[3] filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York. Ex. K., Stipulation. On September 30, 1985, Mott & Hester Restaurant Corp. sold the restaurant including its related fixtures, furnishings and inventory, to a group of purchasers, including plaintiff Vincent Generoso. *Id.* The purchasers and Generoso formed plaintiff Vincent's of Mott Street, Inc. for the purpose of acquiring and operating the Italian restaurant. Generoso Aff. ¶ 2. Under the agreement, the purchasers agreed that they "shall use and operate [the restaurant at 119 Mott Street] under the name of VINCENT'S CLAM BAR, and/or VINCENT'S CLAM BAR OF MOTT & HESTER STREETS, and/or MOTT & HESTER RESTAURANT . . . only at said location without limitation of time and at no other location." Stipulation at ¶ 1.D. The purchase agreement was embodied in a "Stipulation" provided to the bankruptcy court. *Id.* Under the terms of the Stipulation, purchasers agreed not to represent that they are affiliated or connected with any "other business" known under those names "or any facsimile thereof." *Id.* The Stipulation also contained a provision wherein the purchasers "[u]pon information and belief" agreed and acknowledged that Andrew DeLillo was the sole owner of the three marks and that he retained the sole and exclusive right to use the marks. *Id.* at ¶ 1.E. The purchasers agreed that nothing in the purchase agreement should be construed as the sale of the three marks or should be deemed to restrict DeLillo's authority to sell, license, franchise or otherwise convey those marks in any way. *Id.* By its terms, the Stipulation was subject to the approval of the bankruptcy court and the bankruptcy judge "so ordered" the Stipulation on October 29, 1985. *Id.* at ¶ 8.

---

[3] The record is unclear on the division of ownership between DeLillo, individually, and Mott & Hester Restaurant Corp., as a corporate entity, and the relationship between DeLillo and Mott & Hester Restaurant Corp.

Plaintiffs maintain that they began using the name "The Original Vincent's Clam Bar" shortly after taking over the Mott Street restaurant in 1985, with "Established 1904" and "From Little Italy" written next to it in smaller print. Compl. at ¶ 12. They further allege that they dropped any reference to "Clam Bar" in 1989. *Id.* at ¶15. It is undisputed that Plaintiffs began to identify the Mott Street restaurant as "The Original Vincent's Established 1904" by 1989. Generoso Aff. ¶ 7.

In 1992, Defendant acquired the rights to the "Vincent's Clam Bar" name from DeLillo and other interests tied to DeLillo (collectively, "DeLillo Interests"). Pursuant to a series of documents, including a purchase agreement and assignment of trademark signed on July 21, 1992, the DeLillo Interests sold all their rights, title, interests and claims in the "Vincent's Clam Bar" and "Vincent's Clam Bar of Mott and Hester Streets" names and "any [sic] all variations thereto and derivatives thereof," including all "trademarks, trade names, service marks" and the good will associated with the names. Ex. J, Purchase Agreement at ¶ 1(a). At some point, Defendant modified the name on the Carle Place restaurant and began to use the name "The Original Vincent's Clam Bar Established 1904."

On February 11, 1993, Defendant filed an application with the United States Patent and Trademark Office ("PTO") to register the service marks THE ORIGINAL VINCENT'S ESTABLISHED 1904 and VINCENT'S CLAM BAR for restaurant services. Marisi Aff. ¶ 25. Plaintiffs opposed Defendant's application with the PTO, claiming Defendant's mark so resembles their previously used marks to likely cause confusion. Protracted litigation ensued between the parties within the PTO, resulting in a decision nine years later by the Trademark Trial and Appeal Board ("TTAB"), which decided, 2-1, in favor of Plaintiffs. TTAB Dec.

In its September 30, 2002 decision, the majority noted that the 1985 "Stipulation" did not expressly or implicitly prohibit the purchasers from varying the three marks, provided that they did not do so in a way that misrepresented their affiliation with other establishments. *Id.* at 33. The majority then reasoned that the deletion of "the generic term CLAM BAR" could not be "considered a real change to the mark, as it has no source identifying significance," and that "an equitable reading of the stipulation" would permit plaintiffs "to make the minor changes of adding THE ORIGINAL, which accurately describes the restaurant, and the date the restaurant was established to the marks used in connection with the Mott Street restaurant." *Id.*

Although the majority "interpret[ed] the bankruptcy stipulation as allowing [Plaintiffs] the right to use the mark, THE ORIGINAL VINCENT'S ESTABLISHED 1904," it also concluded that the stipulation did not give plaintiffs "ownership rights in that mark." *Id.* at 34. Despite Plaintiff's lack of ownership in the mark, the majority found that their right to use the VINCENT'S CLAM BAR mark pursuant to the 1985 Stipulation was a valid basis to reject Defendant's registration of a geographically-unlimited mark. *Id.* at 34. The majority also rejected Defendant's registration of THE ORIGINAL VINCENT'S ESTABLISHED 1904 mark based on Plaintiffs' priority of use. *Id.* at 34-35.

The dissenting judge, Administrative Trademark Judge Simms, found that the 1985 Stipulation granted Plaintiffs only a limited, "unlicensed right to use the [three] marks in the decree," and that plaintiffs were "[c]ertainly . . . not authorized by the consent decree to change their marks and to adopt another mark which was likely to cause confusion with one of the marks owned by [Defendant]." *Id.* 41-42. Judge Simms also noted that the majority reached an "illogical and untenable legal conclusion" in holding that the mark which Plaintiffs both created and used in connection with their restaurant business for many years had no owner. *Id.* at 43.

On July 31, 2001, a year before the TTAB issued its decision in the matter, plaintiff Generoso filed for registration of the service marks THE ORIGINAL VINCENT'S ESTABLISHED 1904 and VINCENT'S SINCE 1904 for restaurant services with the PTO. Ex. HH. In his applications, Generoso indicated that "he believes himself to be the owner of the Mark[s] sought to be registered" and "no other entity, to the best of his knowledge and belief, has the right to use the Mark[s] in commerce, either in the identical form or in such near resemblance as to be likely . . . to cause confusion, or to cause mistake, or to deceive . . . ." *Id.* Generoso appended several exhibits to his application, including various photocopies of the marks' usage; nevertheless, he did not include the 1985 bankruptcy Stipulation nor reference the proceedings within the PTO regarding Defendant's registration of THE ORIGINAL VINCENT'S ESTABLISHED 1904 and VINCENT'S CLAM BAR for restaurant services. Generoso also did not amend his application in response to the TTAB's 2002 decision concluding the Plaintiffs did not have ownership rights in the Vincent's marks. Defendant indicates that it was unaware of Generoso's application for registration of the two marks. Marisi Aff. ¶ 28. The two marks were duly registered by the PTO on February 8, 2008. Compl. ¶ 26.

Plaintiffs initiated this action on September 14, 2005, asserting five causes of action against Defendant under the Lanham Act §§ 32 and 43(a), FTDA, New York General Business Law §360, and common law unfair competition. Both sides moved for summary judgment on Plaintiffs' claims pursuant to Fed. R. Civ. P. 56. The Court now turns to these claims.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotation marks omitted). The moving party bears the burden of showing that there is no genuine issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant meets this burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c); *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990).

When evaluating a motion for summary judgment, "[t]he court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

## II.    Plaintiffs' Lanham Act Claims

The Court first turns to Plaintiffs' claims for trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114(1), and for false designation of origin or unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[4]   This Court applies the same analysis to both

---

[4]   The marks at issue in this case are "service marks" as they are intended "to identify and distinguish the services of one person . . . from the services of others and to indicate the source of the services[.]" Lanham Act § 45, 15 U.S.C. § 1127. "[B]oth trademarks and service marks are subject to the same substantive rules of validity and infringement" and the Court uses the

claims. *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006). To prevail on the trademark infringement or false designation of origin claims, a party must satisfy this Circuit's two-prong test as set forth in *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072 (2d Cir. 1993). Under this test, Plaintiffs must establish that: 1) they have a valid mark entitled to protection under the Lanham Act; and 2) that Defendant's actions are likely to cause confusion in the marketplace as to the source of the services. *Virgin Enters. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003); *Sports Auth. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996) (citing 15 U.S.C. §§ 1114, 1125).

### A.      Plaintiffs' Ownership of the Mark

The principal dispute in the present case concerns ownership of the mark THE ORIGINAL VINCENT'S ESTABLISHED 1904 under the first prong of the *Gruner + Jahr* test. Plaintiffs contend that their use of THE ORIGINAL VINCENT'S ESTABLISHED 1904 since 1989 and federal registration of the mark in 2005 reflect their status as the owner and senior user of a valid mark entitled to protection. Defendant argues that Plaintiffs' rights in the mark are governed by a contract and, alternatively, Plaintiffs' registration of the mark was fraudulent.

As a threshold matter, the Court must address whether Plaintiffs own a mark that merits protection. When proving ownership of a trademark, federal registration of the mark is "prima facie evidence of the validity of the registered mark and . . . of the registrant's ownership of the mark . . . ." Lanham Act § 7(b), 15 U.S.C. § 1057(b); Lanham Act § 33(a), 15 U.S.C. § 1115(a). Nevertheless, as set forth in 15 U.S.C. § 1115(a), legal and equitable defenses are available to rebut a prima facie showing of ownership. Thus, while "[f]ederal registration is important evidence of ownership of a mark," *Fusco Group, Inc. v. Loss Consultants Int'l, Inc.*, 462 F.

---

terms interchangeably. 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 4:14 (4th ed. 2004).

8

Supp. 2d 321, 327 (N.D.N.Y 2006), the mere fact of registration "does not create substantive ownership rights in the registrant." *Blue Planet Software, Inc. v. Games Int'l, LLC*, 334 F. Supp. 2d 425, 436 (S.D.N.Y. 2004).

Rather, "[o]wnership of a trademark stems from prior appropriation and use." *See Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 118 (2d Cir. 1999); *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1270 n.5 (2d Cir. 1974) (stating that registration "does not create the trademark right; it only recognizes the right acquired through use."). The Second Circuit has also established that the use and ownership of a trademark may be governed by contract between parties. *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 396 (2d Cir. 2002) ("Simple fairness requires holding a party to its contract unless adhering to the contract will damage the public and not just a contracting party."); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, (2d Cir. 1999) (agreement not to use certain marks on defined goods creates a contractual estoppel which precludes the party from such a use in the future); *Croton Watch Co., Inc., v. Laughlin*, 208 F.2d 93 (2d Cir. 1953) (enforcing a contractual agreement between parties in a trademark dispute); *see also Sengoku Works Ltd. v. RMC Intern., Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996) (stating that "courts will look first to any agreement between the parties regarding trademark rights" in a dispute over ownership). Accordingly, "registrations merely offer evidence of ownership, and that showing need not be dispositive of the matter if contrary proof is available." *Blue Planet Software*, 334 F. Supp. 2d at 436.

i.      **The 1985 Stipulation**

In this case, Plaintiffs may trace their lineage to the Vincent's mark to a 1985 purchase agreement. Plaintiff, Vincent Generoso, and his then-business partners ("purchasers") entered into an agreement to purchase the premise at 119 Mott and Hester Streets, New York, N.Y., from

the Mott and Hester Restaurant Corp. in 1985.  *See* Ex. K, Stipulation ¶ 1.  The terms of this

agreement were incorporated in a bankruptcy court stipulation approved and "so ordered" by the

United States Bankruptcy Court for the Southern District of New York on October 29, 1985

(hereinafter, "Stipulation").  *Id.*

> The Stipulation includes, in pertinent part, the following agreements:
>
> 1.D.
> [P]urchasers do not and will not have, nor represent itself [sic] to have, any affiliations or connection with any other business known as VINCENT'S CLAM BAR, VINCENT'S CLAM BAR OF MOTT AND HESTER STREETS, or MOTT AND HESTER RESTAURANT, or any facsimile thereof, and will remove any reference thereof from menus, signs, logos, advertisements and/or any other printed matter used at the premises, and . . . purchasers further agree that they will not, in any way, represent that they are affiliated with any other business licensee or franchisee using said name or names or facsimile thereof and that they shall use and operate their business at the aforementioned premises [119 Mott Street] under the name of VINCENT'S CLAM BAR, and/or VINCENT'S CLAM BAR OF MOTT AND HESTER STREETS, or MOTT AND HESTER RESTAURANT, and only at said location without limitation of time and at no other location, and MOTT & HESTER and ANDREW DELILLO agree to execute an assignable covenant not to compete within a ten-block radius of the premises for the length of the mortgage referred to hereinabove. at the closing. in favor of . . . purchasers, and the parties hereby agree that . . . purchasers are not successors in interest, licensees, franchisees and/or affiliated with MOTT & HESTER
> 1.E.
> Upon information and belief, . . . purchasers hereby acknowledge and agree, subject to the terms of paragraph "1.D." herein, that ANDREW DELILLO is the sole owner of and has the sole and exclusive right to use the name, trademark and copyrights in and to the names VINCENT'S CLAM BAR, VINCENT'S CLAM BAR OF MOTT AND HESTER STREETS, or MOTT AND HESTER RESAURANT, and nothing contained herein shall be deemed a sale thereof nor shall in any way restrict or interfere with said right and interest or his right to use, convey, sell, license, franchise or in any other way dispose of or make use of said names . . .
> 7.
> This stipulation will bind and inure to the heirs, assigns, representatives, successors in interest and/or lessees of the parties hereto.

Ex. K, Stipulation.

Thus, the 1985 Stipulation transferred both the Mott Street restaurant and the property it sits on to the purchasers. *Id.* The Stipulation states that the purchasers shall operate the restaurant under the names of either VINCENT'S CLAM BAR, VINCENT'S CLAM BAR OF MOTT & HESTER STREETS, or MOTT & HESTER RESTAURANT (collectively "the VINCENT'S marks") and that purchasers are precluded from operating a restaurant under those marks at any other location. The Stipulation also requires that purchasers not claim any affiliation or connections with other businesses operating under the VINCENT'S marks. In exchange, DeLillo, who purchased the Vincent's Clam Bar restaurant and mark in 1979, agreed to a finite, geographically-limited covenant not to compete with the purchasers' restaurant. The Stipulation states that purchasers agree that DeLillo is the "sole owner" of the VINCENT'S marks and nothing in the Stipulation shall be deemed to encumber DeLillo's ownership rights. The Stipulation provides that its terms are binding on the parties' successors-in-interest. Defendant later acquired DeLillo's rights, title, interests and claims in the VINCENT'S marks, including "any [sic] all variations thereto," and "the good will associated therewith" in a 1992 Purchase Agreement and Assignment of Trademark. Ex. J, Purchase Agreement ¶ 1(a).

As an agreement requiring the approval of the bankruptcy court, the Stipulation is an equivalent of a consent decree. *See Doe v. Pataki*, 481 F.3d 69, 73 n.3 (2d Cir. 2007) (approving the treatment of a stipulation as a consent decree). It is well-settled that consent decrees "reflect a contract between the parties (as well as a judicial pronouncement), and ordinary rules of contract interpretation are generally applicable." *Id.* at 75; *EEOC v. New York Times*, 196 F.3d 72, 78 (2d Cir. 1999) ("Although consent decrees are judicial orders, they are also agreements between parties that should be construed basically as contracts.") (internal quotation marks omitted). Courts read and apply a consent decree "within its four corners and may not look

beyond the document to satisfy one of the parties' purposes." *EEOC*, 196 F.3d at 78 (internal quotations marks omitted). Thus, courts are to give effect to the "plain meaning" of a consent decree's terms when the language is unambiguous. *United States v. Broad. Music, Inc.*, 275 F.3d 168, 175 (2d Cir. 2001). Under New York law,[5] "[a]n ambiguity exists where the terms of a contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 173 (2d Cir. 2004) (internal quotation marks omitted). The question of whether a particular term of a contract is ambiguous is one of law. *Walk-In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987) (citing *Sutton v. East River Savings Bank*, 55 N.Y.2d 550, 554, (1982)).

### ii.  Consent-to-Use Agreement

Thus, the Stipulation is a binding agreement between the parties' predecessors-in-interest, whose plain meaning must be given effect by this Court. The Court agrees with Defendant that this Stipulation, in this context, is best interpreted as a consent-to-use agreement. In a consent-to-use agreement, the owner of a mark consents to another party's defined usage of a mark in terms of mark format, line of goods or services, or territory, or any combination of these three dimensions. 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:79 (4th ed. 2004). In effect, the agreement amounts to an acknowledgment by the owner of a mark that the other party's usage within the defined format, market or territory is not likely to cause

---

[5]  The Second Circuit has implicitly held that the state law of the forum applies to stipulations settling federal claims. *Doe*, 481 F.3d at 81 n.3 (Pooler, J., dissenting). *See, e.g., Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger*, 423 F.3d 145, 149 (2d Cir. 2005); *Torres v. Walker*, 356 F.3d 238, 245-46 (2d Cir. 2004).

confusion with the owner's usage and, thus, does not constitute an actionable infringement. *Id.; see also Croton Watch Co.*, 208 F.2d at 96 (an admission that there is no confusion is implicit in a consent agreement even where not expressly stated). A consent-to-use agreement is not an assignment or licensing agreement. "It is not an assignment because neither party is assigning any rights of ownership in their mark to the other. It is not a license because [one] party . . . is not granting a right to use to [another party] in return for payment of royalties." MCCARTHY §18:79.

The Stipulation sets a defined usage of the VINCENT'S marks and does not purport to transfer any ownership rights consistent with a consent-to-use agreement. The Stipulation explicitly states that "[purchasers] shall use and operate their business at the aforementioned premises under the name of VINCENT'S CLAM BAR, and/or VINCENT'S CLAM BAR OF MOTT AND HESTER STREETS, or MOTT AND HESTER RESTAURANT, and only at said location without limitation of time and at no other location." The purchasers further explicitly agreed that DeLillo was the sole owner of the VINCENT'S marks and that purchasers would not claim any affiliations or connections with any other businesses operating under those marks. Thus, the Stipulation sets three dimensions of the purchasers' use of the Vincent names: (1) purchasers shall use one of the three VINCENT'S marks (mark format), (2) for the sole purpose of a restaurant (lines of goods and service), (3) at only the Mott Street location (territory). As a consent-to-use agreement, the Stipulation is neither an assignment nor a license. The contract unambiguously gives Plaintiff's predecessors-in-interest only limited, non-ownership rights to use any of the specified VINCENT'S marks and unambiguously establishes that Defendant's

predecessors-in-interest retain "sole" ownership over and "sole and exclusive right to use" the VINCENT'S marks.[6]

The Court reads the Stipulation to unambiguously permit Plaintiffs' the use of only the three marks named therein and to vest sole ownership of the marks in Defendant's predecessor-in-interest. By agreeing that DeLillo was the owner of the marks and by indicating that purchasers had only the unlicensed right to use the three marks, Plaintiffs were not authorized to use marks other than those specified in the Stipulation. In other words, the explicit, mandatory language that purchasers "shall" use either of the three VINCENT'S marks is logically accompanied by the implicit command that restaurant shall not use any other infringing mark. *Cf. Blue Cross and Blue Shield Ass'n v. American Express Co.*, 467 F.3d 634, 639 (7th Cir. 2006) (A contract stating that a party "shall not use the word 'Blue' on its credit cards" means that the use of "Blue Cash" is not permitted on a credit card). Certainly, the purchasers were not

_____

[6] Plaintiffs make the rather specious argument that because the clause denoting the purchasers' acknowledgment and agreement of DeLillo's ownership of the Vincent's names was prefaced by the phrase "[u]pon information and belief," they are not bound by the clause. They argue the provision is something of a nullity because it merely states the parties' belief as to ownership. *See* Pls.'s Mem. Law. Opp. Quadami's M. Summ. J. 4. Nevertheless, New York courts employ the so-called "rule against surplusage" that "a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 405 (2d Cir. 2009) (*citing Corhill Corp. v. S.D. Plants, Inc.*, 9 N.Y.2d 595, 599 (1961)). Thus, regardless of the prefatory clause, the operative text of the provision unambiguously states that purchasers "acknowledge" and "agree" that DeLillo was the sole owner of the VINCENT'S marks and the provision must be given effect. *Cf. Clark v. Kirby*, 231 N.Y.S. 544, 546-47 (N.Y. Sup. Ct. 1928) (holding that a representation by a real estate agent as to a material fact "upon best information and belief" is a sufficient basis for rescission of the contract if it is a misrepresentation)

The Court finds that Plaintiffs' should be held to their predecessors-in-interest's contractual position. A "contract operates by way of estoppel upon each of the contracting parties, precluding each from 'saying that that which by the intervention of himself or his has once become accredited for truth is false.'" *Waukesha Hygeia Mineral Springs Co. v. Hygeia Sparkling Distilled Water Co.*, 63 F. 438, 441 (7th Cir. 1894). Thus, even if DeLillo's ownership of the marks is factually in dispute, by agreeing to the Stipulation, the purchasers and their successors-in-interest are estopped from asserting a contrary position to the agreement in this litigation.

authorized by the Stipulation to alter the VINCENT'S marks and adopt another mark likely to cause confusion with one of the marks owned by DeLillo and his successors. Nothing in the Stipulation would abrogate DeLillo or his successors' ability to make and possess variations to their own marks. Nothing in the Stipulation granted the purchasers the right to appropriate a variation of the VINCENT'S mark and then sue DeLillo's successors-in-interest for infringement.[7] Thus, the Court interprets the plain meaning of the Stipulation to preclude Plaintiffs' ownership of THE ORIGINAL VINCENT'S ESTABLISHED 1904 mark, as an unauthorized variation of the three marks named in the contract and as a violation of DeLillo's unambiguous ownership of the three VINCENT's marks.[8]

The Stipulation's context supports this plain reading of the provision. The Stipulation specifically indicates that nothing in the decree "shall in any way restrict or interfere with" DeLillo's right to sell, license, or franchise its marks. Indeed, if Plaintiff's were permitted to register and own this trademark, it would undoubtedly interfere with Defendant's ownership of the VINCENT'S marks as it would give Defendant no authority or control over an obvious derivation of the VINCENT'S marks. Carving out separate ownership of THE ORIGINAL VINCENT'S ESTABLISHED 1904 from the VINCENT'S CLAM BAR mark would patently

---

[7] Of course, Plaintiffs would be able to abandon the contract by choosing a mark that does not provide a "continuing commercial impression" with Defendant's mark. *See AB Electrolux v. Bermil Industries Corp.*, 481 F. Supp. 2d 325, 332 (S.D.N.Y. 2007). Plaintiffs contend that the ORIGINAL VINCENT'S ESTABLISHED 1904 is "dramatically different in sight, sound and meaning" with VINCENT'S CLAM BAR. Pls. Mem. Law Oppo. Quadami's Mot. Summ. J. 11. The Court disagrees. Plaintiffs use of the new mark patently strengthens its ties to the historical Mott Street restaurant. First, the deletion of the "Clam Bar" is merely a descriptive term that does not break the chain with the Vincent's Clam Bar name. Second, the Siano family established the "original" Vincent's Clam Bar on Mott Street in 1904. The addition of these two historical facts to Plaintiffs' restaurant name distinctly casts a continuing commercial connection with the restaurant they purchased through the 1985 Stipulation and, thus, its terms still govern their usage rights.

[8] The Court applies the same analysis to Plaintiffs' VINCENT'S SINCE 1904 mark. The 1985 Stipulation bars Plaintiffs' ownership of the VINCENT'S SINCE 1904 mark as well.

15

diminish the latter's value and would restrict DeLillo's ability to sell, license or franchise the marks.

The Stipulation also twice mentions the "facsimile" of the VINCENT'S marks. Paragraph 1.D of the Stipulation requires that purchasers "will not have, nor represent itself to have, any affiliations or connection with any other business known as [the VINCENT'S marks], or *any facsimile thereof*" and that purchasers will "not, in any way, represent that they are affiliated with any other business licensee or franchisee using [the VINCENT'S mark] or *facsimile thereof*." Stipulation at ¶ 1.D (emphasis added).   Thus, through these provisions, the parties implicitly agreed that DeLillo could use, license or franchise the VINCENT'S marks and "facsimile[s] thereof." The term "facsimile" is an imprecise term here. "Facsimile" means "an exact and detailed copy of something." WEBSTER'S THIRD NEW INT'L DICTIONARY 813 (2002). The literal meaning of these provisions, therefore, is that DeLillo could utilize the VINCENT'S marks and exact, detailed copies of the names. Such an interpretation would render the terms "facsimile thereof" nugatory as any use of the VINCENT'S mark necessarily entails making exact copies of the names. Although the Court does not rely on this for its decision, this provision likely intended to permit DeLillo to adopt "variations" of the VINCENT'S marks, not "facsimile[s] thereof." Such a reading is consistent with the plain reading of the other provisions allowing Plaintiffs-predecessors-in-interest to use only one of the three articulated VINCENT'S marks and establishing sole ownership rights of the marks with DeLillo. After all, with some limitations, ownership of a mark encompasses the right to alter the mark. *See* MCCARTHY § 17:26 ("A mark can be modified or changed without [loss of trademark rights] if done in such a way that the continuing common element of the mark retains its impact and symbolizes a

16

continuing commercial impression.  Trademark rights inure in the basic commercial impression created by a mark, not in any particular format or style.").

### iii.    Plaintiffs' Contentions

Plaintiffs claim they were permitted to change the VINCENT'S marks in order to distinguish itself from Defendant's restaurant.  While the general tenets of trademark analysis encourage avoiding marketplace confusion, this consent decree supersedes those principles.  The Stipulation establishes two geographically-proximate restaurants operating under the same or similar names, offering the same services, and sharing a common "history" an inherently confusing proposition.  The Second Circuit has recognized that a contract for the "joint use and protection of a trade-mark . . . the use of which might otherwise well be confusing" serves "a legitimate business purpose and are not contrary to public policy." *Chester H. Roth, Inc. v. Esquire, Inc.*, 186 F.2d 11, 15 (2d Cir. 1951).  Indeed, the parties likely had a business purpose in creating some confusion -- DeLillo was permitted to sell the flagship VINCENT'S restaurant to a willing buyer, but was still able to capitalize off the Mott Street restaurant's goodwill by contractually locking in the restaurant's name.  Thus, a plain reading of the contract gives effect to the parties' intentions.

Plaintiffs also argue that the Stipulation should not be read as a "death pact" that prevents these two distinct businesses from creating distinct identities which would diminish customer confusion in the marketplace.  Plaintiff cites nothing in the contract that permits such a reading and this Court interprets the Stipulation by its plain and unambiguous terms.  Without a showing of harm to the health or safety of the public, whether the Stipulation creates a "death pact" is irrelevant to the Court as it was a pact of the parties' own making. *See Times Mirror Magazines, Inc.,* 294 F.3d at 396.  "In the absence of significant harm to the public, the district court

correctly decline[s] to don the mantle of public interest to save plaintiff from a harm that is

permitted by the contract." *Id.* In this case, Plaintiff has not established any harm, let alone

"significant harm." Thus, the Stipulation is a valid and enforceable agreement and it precludes

Plaintiffs' ownership of THE ORIGINAL VINCENT'S ESTABLISHED 1904 mark.[9]

### iv.    Plaintiffs' Failure to Establish Ownership

Since Plaintiffs cannot satisfy the first prong of the *Gruner + Jahr* test, the Court need

not reach the test's second prong. Plaintiffs cannot establish ownership over the marks in

question, and, therefore, they cannot establish a claim under either of § 32 or § 43(a) of the

---

[9] Even if the Stipulation did not bar Plaintiff from claiming ownership of THE ORIGINAL VINCENT'S ESTABLISHED 1904 mark, then traditional trademark analysis would. The Court finds that Defendant owned and retained priority use of the VINCENT'S CLAM BAR mark based on the 1979 sale of the Mott Street restaurant and name from Siano to DeLillo and the 1992 sale of the mark from DeLillo to Defendant. Furthermore, there is no allegation that DeLillo or Defendant abandoned the VINCENT'S CLAM BAR mark. Given these facts, Plaintiffs' adoption of THE ORIGINAL VINCENT'S ESTABLISHED 1904 mark in 1989 is likely to cause confusion with the senior VINCENT'S CLAM BAR mark.

Although the Court need not undertake a full "likelihood to cause confusion" analysis here, it is sufficient to note that the "degree of similarity" in the marks militates strongly in Defendant's favor. *See Polaroid Corp v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). Indeed, both marks give prominence to "VINCENT'S" in the same stylized typeface, dominating it as the dominant portion of the marks. Plaintiffs' elimination of the words "Clam Bar" and the addition of the words "The Original" and "Established 1904" are merely descriptive terms and do not draw a meaningful distinction between the two marks for trademark purposes. This is confirmed by the TTAB majority and dissent which both concluded that a likelihood of confusion exists between the VINCENT'S CLAM BAR and THE ORIGINAL VINCENT'S ESTABLISHED 1904 marks. *See* TTAB 36-37 ("In view of the similarities in the marks, there is a likelihood of confusion as to the source of the parties' identical services identified thereby.") (majority), 42-43 ("The majority states that elimination of the words 'Clam Bar' was no 'real change' in the mark because it deleted only generic matter, and notes that the addition of the words 'The Original' to the mark was done to avoid confusion. The majority, nevertheless, finds that this attempt was unsuccessful since the revised mark and both of applicant's marks are still likely to cause confusion.") (dissent). "[T]he decisions of the TTAB, while not binding on courts within this Circuit, are nonetheless to be accorded great weight." *Courtenay Communications Corp. v. Hall*, 334 F.3d 210, 216-17 (2d Cir. 2003) (internal quotation marks omitted). Accordingly, the Court finds that Plaintiffs' junior THE ORIGINAL VINCENT'S ESTABLISHED 1904 mark so resembles Defendant's senior VINCENT'S CLAM BAR mark as to likely cause confusion that Plaintiffs cannot claim ownership of the former mark.

Lanham Act.  The Court grants summary judgment as to the Lanham Act claims and hereby dismisses them.

## III.   Plaintiffs' Other Claims

Plaintiffs also assert a common law claim for unfair competition as well as state and federal statutory claims for dilution under New York General Business Law § 360-l and the FTDA, 15 U.S.C. § 1125(c).

The Court need not separately address Plaintiffs' common law claim for unfair competition "because the law of trademark infringement is subsumed in the law of unfair competition and the same test is applied in determining each claim." *Long Island-Airports Limousine Serv. Corp. v. N.Y. Airport Servs. Corp.*, 641 F.Supp. 1005, 1010 (E.D.N.Y. 1986) (*citing Am. Footwear Corp. v. Gen. Footwear Co.*, 609 F.2d 655, 664 (2d Cir. 1979)). Furthermore, the "standard for unfair competition under the Lanham Act differs very little from that under New York law." *E. R. Squibb & Sons, Inc. v. Cooper Labs., Inc.*, 536 F.Supp. 523, 526 (S.D.N.Y. 1982).  Thus, the failure to establish a trademark infringement claim also precludes Plaintiffs from establishing a common law unfair competition claim.

Similarly, both federal and state dilution laws protect the "owner of a famous and distinctive trademark from 'dilution' of its mark." *Fed. Exp. Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 174 (2d Cir. 2000).  The FTDA "permits the owner of a qualified, famous mark to enjoin junior uses throughout commerce, regardless of the absence of competition or confusion." *TCPIP Holding Co. v. Haar Commc'ns Inc.*, 244 F.3d 88, 95 (2d Cir. 2001).  Since Plaintiffs cannot demonstrate that they are "owners" of a mark, let alone a "famous and distinctive" trademark, they cannot succeed in asserting federal or state dilution claims under the FTDA or N.Y. General Business Law § 360-l.

Accordingly, the Court grants summary judgment in favor of Defendant, dismissing all other claims in their entirety.

## IV.   Plaintiffs' Service Mark Registrations

Having determined that Plaintiffs do not own the mark in THE ORIGINAL VINCENT'S ESTABLISHED 1904 and VINCENT'S SINCE 1904, the Court turns to the marks' registration with the PTO under Registration Nos. 2924610 and 2816073, respectively.  By express congressional authority, courts have broad authority to correct trademark registrations.  *Patsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 2d 427, 464 (E.D.N.Y. 2008).  The Lanham Act provides that "[i]n any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." Lanham Act § 37, 15 U.S.C. § 1119.  "The net effect of § 37 is to give to the courts concurrent power with the Patent and Trademark Office to conduct cancellation proceedings.  Thus, a registration may be collaterally attacked in any civil action where validity of the mark is in issue." 5 McCARTHY § 30:109 (footnotes omitted).  Courts' authority to cancel a trademark extends when a party raises cancellation either as a defense or as a separate cause of action or counterclaim.  *See Patsy's Italian Rest., Inc.*, 575 F. Supp. 2d at 464, *citing Bascom Launder Corp. v. Telecoin Corp.*, 204 F.2d 331, 335-36 (2d Cir. 1953).

In this case, Defendant sought cancellation of Plaintiffs' registrations as its Ninth Affirmative Defense and First Counterclaim.  Def. Answer and Countercl. ¶¶ 71-104.  Thus, the cancellation of trademarks was properly pleaded and, in its motion papers, Defendant asks this Court to "exercise its authority under 15 U.S.C. § 1119 by ordering the cancellation of Plaintiffs' . . . United States Registration No. 2,924,610 . . . and United States Registration No. 2,816,073 . .

. ." Mem. L. in Supp. Def.'s M. Summ. J. 15. Plaintiffs were, thus, on notice that this Court might reach this issue if it found that Plaintiffs do not own the registered marks. Nevertheless, nothing in Plaintiffs' numerous motion papers challenges the Court's ability to cancel its registration. For the sake of an efficient resolution to this litigation, the Court will now rule on this issue.

The Court finds that there is a proper basis to cancel Plaintiffs' Registrations 2924610 and 2816073. The Lanham Act provides that no trademark registration shall be issued if it "[c]onsists of or comprises a mark which so resembles . . . a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive. . . ." Lanham Act § 2, 15 U.S.C. § 1052(d); *see also* Lanham Act § 3, 15 U.S.C. § 1053 (stating that the same procedures and effect apply to service marks). First, as noted above, Plaintiffs do not own THE ORIGINAL VINCENT'S ESTABLISHED 1904 and VINCENT'S SINCE 1904 marks, pursuant to the 1985 Stipulation. Second, Defendant has established priority ownership of the VINCENT'S CLAM BAR mark through the 1985 Stipulation and the 1992 purchase agreement and assignment of trademark. Third, the TTAB has already opined, and the Court agrees, that THE ORIGINAL VINCENT'S ESTABLISHED 1904 mark creates a likelihood of confusion with the VINCENT'S CLAM BAR mark. *See* note 7 *supra*. Accordingly, the Court directs the PTO to cancel United States Registration No. 2924610 and 2816073. *See Patsy's Italian Rest., Inc.*, 575 F. Supp. 2d at 463-69.

While the Court is reluctant to take this measure, it is a result of Plaintiffs' own actions. Plaintiffs sought the registration of the two marks during the pendency of Defendant's proceedings to register THE ORIGINAL VINCENT'S ESTABLISHED 1904 mark,

unbeknownst to either Defendant or the TTAB. In Plaintiffs' application for registration of these two marks, it failed to disclose the provisions of the 1985 Stipulation. *See* Ex. HH. While the Court does not reach Defendant's contention that Plaintiffs perpetrated a fraud on the PTO, the 1985 Stipulation was a patently relevant issue that would have affected the disposition of the matter. Furthermore, once the TTAB issued its decision in Defendant's proceeding, Plaintiffs were on notice that their claim of ownership in the marks was in question. Nevertheless, Plaintiffs failed to amend their applications for the marks, which affirmatively stated that Generoso owned the marks and that no other entity had the right to use the marks. Thus, the Court's interference with the Plaintiffs' registrations could have been avoided if Plaintiffs had sought registration of the marks with full disclosure to all parties and the PTO.

**CONCLUSION**

In conclusion, the Court hereby orders as follows: (1) Plaintiffs' Complaint against Defendant is dismissed in its entirety; (2) the U.S. Patent & Trademark Office is ordered to cancel Plaintiffs' Registration No. 2924610 for the mark THE ORIGINAL VINCENT'S ESTABLISHED 1904 for restaurant services; (3) the U.S. Patent & Trademark Office is ordered to cancel Plaintiffs' Registration No. 2816073 for the mark VINCENT'S SINCE 1904 for restaurant services; and (4) the Clerk of the Court is directed to report on the determination of this Memorandum and Order to the U.S. Patent & Trademark Office.

**SO ORDERED.**

Dated: Brooklyn, New York
      September 28 , 2009

                                       s/ SLT

                                         SANDRA L. TOWNES
                                         United States District Judge